Robert Earl WILLIAMS, Appellant,

v.

UNITED STATES of America,
Appellee.

Gerald COLEMAN, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 21269, 21270.

United States Court of Appeals
District of Columbia Circuit.

Reargued June 20, 1969.

Decided Oct. 23, 1969.

J. Skelly Wright and Spottswood W. Robinson, III, Circuit Judges, and Bazelon, Chief Judge, dissented in part.

Mr. Philip B. Brown, Washington, D. C. (appointed by this Court), for appellants.

Mr. Roger E. Zuckerman, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., at the time the brief was filed, and William H. Collins, Jr., Asst. U. S. Atty., were on the brief, for appellee.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON and ROBB, Circuit Judges, sitting *en banc.*

LEVENTHAL, Circuit Judge:

On a June afternoon in 1965, two men armed with pistols shot and killed the proprietor of a liquor store while attempting to rob him. They escaped in a car driven by a third man. An informer's statement led to the arrest of appellant Williams as one of the gunmen. Williams was arrested without a warrant at his brother's house. Before presentment to a commissioner, Williams was held overnight and then placed in a lineup and shown to eyewitnesses, one of whom (Mrs. Neal) identified him. Mrs. Neal then picked Coleman's picture out of a group of four photographs, and subsequently identified Coleman at a lineup as the other gunman.

In July 1966 Williams, Coleman, and the alleged driver of the escape vehicle, Bland, were brought to trial on charges of attempted robbery and felony murder. After long deliberation the jury could not agree and a mistrial was declared. In May 1967 the defendants were tried again. The Government's case against Williams and Coleman consisted chiefly of Mrs. Neal's identification of them— both her in-court identification and her testimony about the lineups. Mrs. Neal, who was in the store at the time of the robbery, was positive about her identification and stated that she got a good look at the robbers when they entered. She also watched them for a few minutes until they pulled their guns and began struggling with the proprietor. In addition, two other witnesses, one a 12-year-old boy, identified Williams and Coleman at the trial although neither had been able to identify Williams at a lineup and neither had seen the Coleman lineup.

Williams and Coleman presented alibi defenses. Williams' girl friend and two other friends testified that Williams was picking up the girl friend's children at the time of the robbery. Coleman and another man testified that they were in Baltimore on the day in question, working as a two-man confidence game team. After three days of deliberation the jury returned guilty verdicts against Williams and Coleman for attempted robbery and felony murder. Each was given a life sentence on the murder count and a concurrent one-to-three-year sentence on the robbery count. Bland was acquitted.

After decision by a three-judge panel on appeal, these cases were set for hearing en banc because of the importance of issues raised.[1]

1. Appellants raise contentions in addition to those treated in detail in this opinion:

As to Williams it is claimed:

(a) That there was no probable cause for his arrest. We find that there was probable cause. An informer, stated to be reliable in the past, gave a statement implicating Williams. The statement was corroborated by several known facts about the robbery.

(b) That his arrest was illegal because the police officers who arrested him failed to obtain a warrant for his arrest. This is a claim that requires an evidentiary predicate. Since this point was not raised at trial, it is not being considered on this appeal.

(c) That there was improper advocacy by the prosecutor in summation. We have examined the record and do not find reversible error.

As to Coleman there are additional claims:

(a) That the failure to present him to a magistrate resulted in his unknowing waiver of a preliminary hearing. There was no timely objection to the lack of a preliminary hearing, and in any case there was no prejudice because the entire Government case was known to Coleman after the first trial ended in a mistrial.

(b) That his lineup in Baltimore was held in violation of *Mallory.* Apart from the discussion in the opinion on the claim

## I. *Applicability of the* Mallory *Rule to Lineups*

■ 1. Appellant Williams relies on the *Mallory* rule, Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L. Ed.2d 1479 (1957), which implements Rule 5(a) of the Federal Rules of Criminal Procedure by making confessions obtained by police interrogation before presentment to a commissioner inadmissible at trial. He contends the *Mallory* rule requires that the court hold inadmissible the results of a lineup held prior to presentment to a commissioner. We disagree.

Prior to the advent of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L. Ed.2d 1149 (1967), this court on several occasions declined to extend the holding of *Mallory* to lineups held prior to preliminary hearing.[2]

Williams says a contrary result is mandated by *Wade.* His syllogism runs: *Mallory* is intended to assure that the defendant is promptly and judicially advised of his right to counsel for any "critical" stage of the prosecution. *Wade* established that the lineup is a "critical" stage of the prosecution. Therefore, lineups held prior to presentment to a commissioner are inadmissible. The syllogism seems neat, but misapprehends the *Mallory* doctrine and the *Wade* ruling. In *Wade* the Supreme Court established the right to assistance of counsel at a lineup because the lineup is a "critical" stage of the criminal prosecution. Yet in Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the Supreme Court determined that pre-*Wade* cases in which the right to counsel at the "critical" lineup stage had not been extended would not be overturned unless the lineup "was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." 388 U.S. at 302, 87 S.Ct. at 1972.

The Supreme Court denied retroactive effect to *Wade*, as to confrontations on or before June 12, 1967, stating (388 U.S. at 297, 87 S.Ct. at 1970):

> *Wade* and *Gilbert* fashion exclusionary rules to deter law enforcement authorities from exhibiting an accused to witnesses before trial for identification purposes without notice to and in the absence of counsel.

The Court's ruling that the deterrent purpose of *Wade* was satisfied by a prospective application plainly drew a distinction between different "critical stages" of the prosecution, a distinction between trials (and certain arraignments) where presence of counsel had been made a retroactive requirement, and lineups, as to which the right of counsel had only prospective application. The Court concluded that the post-indictment lineup without counsel did not fall within the precept that requires retroactive application "to correct serious flaws in the fact-finding process." (388 U.S. at 298, 87 S.Ct. at 1970). The Court held that although some danger of unfairness is inherent in confrontations for identification, and the "possibility of unfairness at that point is great," the delineation of rights of the accused requires an assessment of a "question of *probabilities.*" "Such probabilities must in turn be weighed against the prior justified reliance upon the old standard and the impact of retroactivity upon the administration of justice." 388 U.S. at 298, 87 S.Ct. at 1970.

---

made by Williams, Coleman has a disability in making a *Mallory* claim, in view of the fact that he was in custody in Baltimore, on a state charge, when Mrs. Neal was taken to view him in a lineup. Only afterward was he arrested on the federal charge and then promptly arraigned.

2. Kennedy v. United States, 122 U.S.App. D.C. 291, 353 F.2d 462 (1965); Williams v. United States, 120 U.S.App.D.C. 244, 247, 345 F.2d 733, 736 (1965) (concurring opinion of Judge Burger), cert. denied, 386 U.S. 1010, 87 S.Ct. 1354, 18 L.Ed.2d 438 (1967); Copeland v. United States, 120 U.S.App.D.C. 5, 343 F.2d 287 (1964); Mitchell v. United States, 114 U.S.App.D.C. 353, 357 n. 9, 316 F.2d 354, 358 n. 9 (1963); Fredricksen v. United States, 105 U.S.App.D.C. 262, 266 F.2d 463 (1959).

The considerations examined by the Supreme Court in *Stovall* lead to the conclusion that we should not characterize what the police did here in 1965 as contrary to Rule 5(a) and *Mallory*. Different considerations apply to identifications after *Wade*, for then police were fairly on notice that the right to counsel was a generally necessary ingredient in lineups.[3]

The Supreme Court's conclusion that there is no categorical imperative that required the condemnation of a pre-*Wade* lineup held in the absence of counsel also means that there is no imperative requiring condemnation of a pre-*Wade* lineup held in the absence of a commissioner's advice to the suspect that he had a right to counsel. He had no such universal right prior to *Wade*, and Rule 5(a) should not be re-read in the light of such a supposed right.[4]

█ 2. While the case at bar does not require decision concerning the application of *Mallory* to post-*Wade* identifications, it is appropriate to comment on certain aspects of this problem, particularly in view of discussion by counsel as to the import of Adams v. United States, 130 U.S.App.D.C. 203, 399 F.2d 574 (1968). In one aspect *Adams* reiterates that a detention without probable cause cannot be justified on the ground that the police wish to arrange a lineup, and establishes the inadmissibility of any product of such lineup. That ruling has been fortified by the subsequent decision in Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). The other side of the *Adams* coin dispels any

concern of the police that, assuming detention consistent with the Fourth Amendment, they must hasten to arrange lineups prior to preliminary hearing lest the opportunity for lineup be lost once the suspect is released on bail or recognizance.

The commissioner may assure that the suspect will be available for a lineup in any of several ways: by making it a condition of release, by suspending the order of release, or by continuing the preliminary hearing until the lineup is completed.

In a case in which the arrest was made on probable cause but further investigation clouds the issue, the commissioner's power to provide for a lineup can be justified, without regard to other reasons that may be found, as part of a process of obtaining the fullest information possible before making his ruling on the issue of further detention.

Since the police and prosecutors may implement identification procedures with the aid of judicial authority, as noted above, it may be hoped that the courts will not have to grapple with a claim that law enforcement officials are authorized even without such authority to extend a detention in order to obtain a post-*Wade* identification confrontation.

██ If any such claim is made it will be assessed in the light of all the circumstances—the situs, method, length, and purpose of detention,[5] and whether the delay promotes, rather than hampers, fairness to the individual and effective and intelligent law enforcement.[6] If the

---

3. Even this statement is subject to the possibility of exceptions if the defendant is provided "substitute counsel," or if changes appear in underlying provisions of statutes of regulations governing lineups. United States v. Wade, 388 U.S. 218, 237, 239, 87 S.Ct. 1926 (1967).

4. Technically Judge Burger's concurrence in Adams, Stuckey & Roots v. United States, 130 U.S.App.D.C. 203, 399 F.2d 574 (1968), seems to embody a conclusion contrary to ours. His opinion does not expressly comment on the retroactive ap-

plication. So far as its reasoning is concerned, it more nearly comports with a prospective and not a retroactive application of the reconstruction of the *Mallory* rule in the light of *Wade*.

5. Trilling v. United States, 104 U.S.App. D.C. 159, 260 F.2d 677 (1958).

6. Wise v. United States, 127 U.S.App.D.C. 279, 383 F.2d 206, 24 A.L.R.3d 1255 (1967), cert. denied, 390 U.S. 964, 88 S. Ct. 1069, 19 L.Ed.2d 1164 (1968).
*Wise* involved sight and voice identifications at the scene of and shortly after the

lineup or other identification procedure is made in the presence of counsel for the suspect, there would be no basis for a claim the identification was excludible as a fruit of illegal delay in presentment. The question might arise in a case where the confrontation was made in the absence of counsel, on a claim that counsel was not required under *Wade*,[7] or that counsel had been waived, and if it arises the post-*Wade* relationship of *Mallory* and *Wade* may require further exploration.

## II. *The Polling of the Jury*

█ Appellant Coleman attacks the procedure by which a poll of the jury was taken by the clerk, pursuant to request of defense counsel after the foreman announced the verdict.

Mrs. Lillian Ansher was the first to be polled. The transcript shows the following:

THE DEPUTY CLERK: Lillian Ansher, what say you as to the defendant Frederick D. Bland on Count 1?

MR. SHORTER: Your Honor—

THE COURT: On this with respect to the defendant Robert Williams.

THE DEPUTY CLERK: Oh, just as to him only?

THE COURT: At the request of his counsel.

THE DEPUTY CLERK: Lillian Ansher, what say you as to the defendant Robert E. Williams on Count 1?

MRS. ANSHER: Guilty.

THE DEPUTY CLERK: What is the punishment?

MRS. ANSHER: Death—no. Life. [The poll as to Williams continued.]

\*   \*   \*   \*   \*   \*

THE COURT: Let the jury be polled as to Gerald Coleman.

THE DEPUTY CLERK: Lillian Ansher, what say you as to the defendant Gerald Coleman on Count 1?

MRS. ANSHER: Innocent.

THE DEPUTY CLERK: I didn't hear what you said. Mrs. Lillian Ansher—.

MRS. ANSHER: Not guilty.

THE DEPUTY CLERK: What was that?

MRS. ANSHER: Not guilty.

THE COURT: Repeat the question to the juror.

---

crime. Delays before presentment have also been held unobjectionable, in cases where the arrest was lawful, where the purpose of delay was—

(1) To fingerprint and photograph. United States v. Klapholz, 17 F.R.D. 18 (S.D.N.Y.1955) affd. 230 F.2d 494 (2d Cir.), cert. denied, 351 U.S. 924, 76 S. Ct. 781, 100 L.Ed. 1454 (1956).

(2) To verify quickly an alibi of the accused. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356 (1957).

(3) To track down an accomplice. Rogers v. United States, 330 F.2d 535 (5th Cir.), cert. denied, 379 U.S. 916, 85 S.Ct. 265, 13 L.Ed.2d 186 (1964).

(4) To complete an explanation of involvement stated in an interview concerning suspicious circumstances, begun prior to arrest. (William) Fuller v. United States, 132 U.S.App.D.C. 264, 407 F.2d 1199 (1967) released following issuance of (William) Fuller v. United States, 132 U.S.App.D.C. 286, 407 F.2d 1221 (1968) (*en banc*). *Fuller* involved a pre-*Miranda* statement.

(5) To transcribe an oral confession spontaneously given upon arrest. La-Shine v. United States, 126 U.S.App. D.C. 71, 374 F.2d 285 (1967); Bailey v. United States, 117 U.S.App.D.C. 241, 328 F.2d 542, cert. denied, 377 U.S. 972, 84 S.Ct. 1655, 12 L.Ed.2d 741 (1964); but see Cunningham v. United States, 119 U.S.App.D.C. 262, 340 F.2d 787 (1964).

(6) To search surrounding premises. Williams v. United States, 273 F.2d 781 (9th Cir.), cert. denied, 362 U.S. 951, 80 S.Ct. 862, 4 L.Ed.2d 868 (1960); *compare* Greenwell v. United States, 119 U.S.App.D.C. 43, 336 F.2d 962 (1964), cert. denied, 380 U.S. 923, 85 S.Ct. 921, 13 L.Ed.2d 807 (1965).

7. The Court indicated that the need for prompt lineups might warrant their being held in the presence of "substitute counsel" (388 U.S. at 237, 87 S.Ct. 1926), or even without substitute counsel if fairness were assured by amendment of statute or regulation (388 U.S. at 239, 87 S.Ct. 1926).

THE DEPUTY CLERK: Mrs. Ansher, what say you as to the defendant Gerald Coleman on Count 1?

MRS. ANSHER: Guilty.

THE DEPUTY CLERK: What is the recommendation for punishment?

MRS. ANSHER: Prison.

THE DEPUTY CLERK: What was that?

THE COURT: Did you hear the question?

MRS. ANSHER: No.

THE COURT: Repeat the question, Mr. Clerk.

THE DEPUTY CLERK: What is your recommendation for punishment as to Gerald Coleman on Count 1?

MRS. ANSHER: Guilty.

The DEPUTY CLERK: I say what is your recommendation for punishment?

\*   \*   \*   \*   \*   \*

MRS. ANSHER: I am confused right now.

\*   \*   \*   \*   \*   \*

THE DEPUTY CLERK: Mrs. Ansher, what is your recommendation—

THE COURT: I don't think she can hear you because I can't hear.

THE DEPUTY CLERK: Mrs. Ansher, Lillian Ansher, what is your recommendation for punishment as to the defendant Gerald Coleman on Count 1?

MRS. ANSHER: To be convicted, I guess.

THE COURT: I can't hear you.

THE DEPUTY MARSHAL: Can you understand the Clerk?

MRS. ANSHER: Yes, I can.

THE DEPUTY CLERK: What is your recommendation for punishment of Gerald Coleman on Count 1?

MRS. ANSHER: Guilty.

THE COURT: You may step back.

(Juror No. 1 returns to place in line of jurors.)

\*   \*   \*   \*   \*   \*

THE COURT: Continue the poll.

THE DEPUTY CLERK: Richard B. Sladen—

THE COURT: No. With respect to Count 3 [robbery count].

THE DEPUTY CLERK: Mrs. Lilian Ansher, what say you as to the defendant Gerald Coleman on Count 3?

MRS. ANSHER: Robbery and killing.

After the other jurors were polled, defense counsel moved for a mistrial on the ground that Mrs. Ansher was incompetent. The court sent the jury back to the jury room and told it to "determine what is in fact their unanimous verdict. \* \* " Twenty-two minutes later the jury returned and the foreman announced a unanimous verdict as to each defendant, Williams and Coleman, of guilty on both the murder and robbery counts. The defense did not request a further poll and none was conducted. The court accepted the verdict.

There is no doubt that as the polling of the jury proceeded Mrs. Ansher became confused. The trial court concluded that she became confused but was not incompetent, and the record supports that conclusion. Defense counsel contends in the alternative that the juror was coerced into finding Coleman guilty. This leads us into a review of the record as to how it came about that the juror became confused.

The poll began with a question as to defendant Bland, and questioning was then switched to defendant Williams. Mrs. Ansher might well have concluded that the questioning at the end of the Williams poll was reverting to Bland, whose poll had been interrupted. Her reply of "Innocent" corresponded in fact to the verdict for Bland on the first count.

The confusion from the switching of defendants was compounded by the obvious fact that both judge and jurors were having a hard time hearing the deputy clerk. Further confusion was provided by the necessity—because the clerk could not hear the juror's answer—for repeat-

ing the question on the Coleman verdict on Count 1.

The trial judge properly tried to clarify the confused verdict of Mrs. Ansher. In our view these efforts were essentially neutral and are not objectionable as having been intended or calculated to affect her judgment.

■■ There is a distinction in law and in fact between actions of the trial judge to obtain clarity in place of confusion, and actions that produce a likelihood that a juror has been coerced. It is basic to our system of justice that a verdict of guilty in a criminal case may stand only if freely given and unanimous. Andres v. United States, 333 U.S. 740, 68 S.Ct. 880, 92 L.Ed. 1055 (1948). The Supreme Court has condemned, as coercive in its tendency, a judge's action in asking a jury reporting inability to agree to reveal its division and then sending the jury back. Brasfield v. United States, 272 U.S. 448, 450, 47 S.Ct. 135, 71 L.Ed. 345 (1926). However the fact that there is some uncertainty in the first instance concerning the verdict does not require setting the trial at naught. The polling of the jury can serve to clear up apparent confusion on the part of the jury. United States v. Grosso, 358 F.2d 154 (3d Cir. 1966), revd. on other grounds, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968).

The judge's conduct has been held improper where there were strong indications that a jury was not unanimous and the repeated efforts of the judge to obtain a unanimous verdict had a coercive effect. Bruce v. Chestnut Farms-Chevy Chase Dairy, 75 U.S.App.D.C. 192, 126 F.2d 224 (1942). It is not the law, however, that impermissible coerciveness is demonstrated by the mere fact that the announcement by one juror seems to differ from the judgment of the other jurors. On the contrary, Rule 31(d) of the Federal Rules of Criminal Procedure provides: "If upon the poll there is not a unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged." The discussion in the jury room may clear up that whatever seemed to suggest a division in the courtroom was merely a mistake in hearing, or understanding, and that in fact there was unanimity.[8]

We think the trial court acted within its discretion when it asked the jury "to retire back to the jury room and notify the court when they are ready to give a unanimous verdict." No time limits were set. Twenty-two minutes later the jury returned, the foreman again announced appellants guilty of counts 1 and 2, with recommendation of life imprisonment. The foreman's advice that the verdicts were unanimous was not challenged. Defense counsel did not claim at the time that juror Ansher was being coerced into final agreement on the unanimous verdict. We see no abuse of discretion warranting reversal by this court. (Van Dyke) Jackson v. United States, 128 U.S. App.D.C. 214, 386 F.2d 641 (1967).[9]

8. We need not concern ourselves now with the case in which the the announcements of the jurors make it clear that one juror differs with the others, and the return to the jury room is for the purpose of obtaining a unanimity that plainly did not exist when they first came in to announce their verdict. That kind of further deliberation is also apparently contemplated by Rule 31(d), but there may well be a problem of coerciveness under the particular facts of the case. It seems best to avoid general pronouncements on the subject and to address ourselves to particular issues as they may arise. In the case before us the proceedings in court certainly gave every indication that although one juror was confused in her answers, there had been unanimity in fact, and the return to the jury room served merely to obtain clarity in the expression of the previous fact of unanimity. It is on that basis and assumption that the case is being decided.

9. In that case during a jury poll by the deputy clerk, a Mrs. Knight answered, "I went along with the majority—guilty." The judge intervened to clarify what she had said, and questioned further whether "Guilty" was her response. She answered affirmatively, and defense counsel did not object that the verdict was not unanimous but a product of the stress of the exchange. In commenting on failure to object, this court said:

"A principal office of the making of objections by counsel in adversary pro-

We turn to another matter that may well have contributed to the confusion of the juror in this case: the archaic and confusing form in which the courtroom clerk intones the polling of the jury. Why should a clerk ask: "What say you as to the defendant * * *?" Why not, simply and directly: "What is your verdict as to the defendant * * *?" And when the foreman announced the verdict, the clerk asked: "And that is your verdict, so say you each and all?" Why not, again more simply and directly: "Is that the verdict of each and every one of the jurors?" There is a role for ceremony in public life, and perhaps some of the archaic forms of the law serve to impress on us the long reach back into history of the rule of law. But ritual must be harmonized with clarity, and it certainly may not be permitted to override clarity with regard to a matter like a jury poll, where the need for clarity is at zenith. This is a matter that might well merit the attention of the District Judges.

### III. *The* Stovall *Issue*

█ Appellate counsel for both defendants raise questions as to whether the lineups and in-court testimony on identification constitute the kind of unfairness that taints a conviction under Stovall v. Denno. These claims are not frivolous, but neither are they appropriate for disposition by this court, at least in the first instance. We remand on this issue for Stovall hearings and appropriate determinations concerning the identification of appellants. *Cf.* Wright v. United States, 131 U.S.App.D.C. 279, 404 F.2d 1256 (1968).

So ordered.

ceedings is not only to assure justice but also to achieve efficiency and expedition in its administration. * * * Although the court's inquiry did not perhaps exhaust the solicitude appropriate to a situation of this kind, particularly when the circumstances actually obtain-

MacKINNON, Circuit Judge (concurring):

I concur in Judge Leventhal's opinion. In my opinion the dissent fails to recognize the extent to which the questioned colloquy between the clerk and the juror might have been caused by the difficulty of the juror in hearing or understanding the clerk. The confusion at that time could have been caused by tone, enunciation, lack of volume or some other factor. The record reflects the judge as stating: "I don't think she can hear you, because I can't hear." Thus presented were factors that were within the peculiar province of the trial judge to note, judge and act upon. I consider that he properly discharged this responsibility.

The dissent also comments on the fact that at the outset of the jury poll one juror stated three times that Coleman was not guilty. I feel consideration is also required to be given to the fact that the same juror immediately thereafter responded five times that Coleman was guilty or that the punishment was prison; since all of said replies indicate that the juror considered that defendant guilty.

J. SKELLY WRIGHT, Circuit Judge, with whom Chief Judge BAZELON and Circuit Judge SPOTTSWOOD W. ROBINSON, III, join (dissenting in part and concurring in part):

### I

In Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), the Supreme Court, under its supervisory powers, implemented Rule 5(a) of the Federal Rules of Criminal Procedure by holding that confessions obtained by police interrogation prior to presentment of the defendant before a magistrate

ing are difficult to communicate to an appellate court in a cold record, we are not prepared to say that the court erred in its appraisal at the time of the genuineness of Mrs. Knight's verdict."
128 U.S.App.D.C. at 216, 386 F.2d at 643.

could not be admitted into evidence at trial. The Court stated that after arrest the defendant must be arraigned "as quickly as possible." 354 U.S. at 454, 77 S.Ct. 1356, 1 L.Ed.2d 1479. The concerns behind the *Mallory* rule were most recently stated by this court in Adams v. United States, 130 U.S.App.D.C. 203, 208, 399 F.2d 574, 579 (1968):

"* * * [W]e emphasize that what the defendant acquires by that presentment is, first, *judicial* advice of his rights, including the provision of counsel; and, second, the opportunity to regain his freedom forthwith by persuading the magistrate that there is no probable cause to hold him for the crime for which he was arrested. These are important legal rights which Rule 5(a) was designed to secure—so important, indeed, that the Supreme Court has ruled that the exclusion of otherwise admissible evidence is not too high a price to pay to assure their availability to all persons."

(Emphasis in original.)

Prior to United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), and Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), this court had not applied the *Mallory* rule to a lineup situation. Several cases denied such a claim.[1] Instead the court focused on police interrogation as the object of the *Mallory* exclusionary rule. Still, the practice of unnecessarily delaying presentment of a defendant while lineup evidence is collected did not escape unfavorable comment. For example, in Payne v. United States, 111 U.S.App.D.C. 94, 98, 294 F.2d 723, 727,

cert. denied, 368 U.S. 883, 82 S.Ct. 131, 7 L.Ed.2d 83 (1961), we said:

"* * * [W]e do not condone lengthy detention for the purpose of rounding up complaining witnesses so that they may view a suspect * * *."

This court repeated its disapproval in Gatlin v. United States, 117 U.S.App.D.C. 123, 128 n. 9, 326 F.2d 666, 671 n. 9 (1963), stating: "We thought we had made it clear in *Payne*" that delayed presentment in order to hold a lineup is not condoned.

In the recent decision in Adams v. United States, *supra,* a post *Wade-Gilbert-Stovall* case, the *Mallory* rule was applied to a lineup situation. There *Mallory* was held applicable to a lineup identification made while the defendant was in custody for one charge and the lineup was held for, and used at trial on, another charge, for which no lawful arrest had been made.

After they arrest a person, the police, of course, have a right to continue collecting evidence against him. Nothing in the *Mallory* rationale requires that the investigative process come to a stop once an arrest is made. I view the purpose of the *Mallory* rule, however, as requiring the police promptly to present the defendant to a magistrate so he can be judicially advised of his rights, including the right to counsel and, if requested, be provided with counsel to protect him during any "critical" stage in the prosecution against him.

The teaching of United States v. Wade, *supra,* is that the lineup is just such a stage. In holding the right to counsel applicable to lineups the Supreme Court stated:

"* * * [T]he confrontation compelled by the State between the accused

---

1. Kennedy v. United States, 122 U.S.App. D.C. 291, 353 F.2d 462 (1965); Williams v. United States, 120 U.S.App.D.C. 244, 247, 345 F.2d 733, 736 (1965) (concurring opinion of Judge Burger), cert. denied, 386 U.S. 1010, 87 S.Ct. 1354, 18 L.Ed.2d 438 (1967); Copeland v. United States, 120 U.S.App.D.C. 5, 343 F.2d 287 (1964); Mitchell v. United States, 114 U.S.App.D.C. 353, 357 n. 9, 316 F.2d 354, 358 n. 9 (1963); Fredricksen v. United States, 105 U.S.App.D.C. 262, 266 F.2d 463 (1959).

and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial. The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification. \* \* \*"

388 U.S. at 228, 87 S.Ct. at 1933, 18 L.Ed. 2d 1149. (Footnote omitted.) The Court concluded:

"Since it appears that there is grave potential for prejudice, intentional or not, in the pretrial lineup, which may not be capable of reconstruction at trial, and since presence of counsel itself can often avert prejudice and assure a meaningful confrontation at trial, there can be little doubt that for Wade the post-indictment lineup was a critical stage of the prosecution \* \* \*. \* \* \*"

388 U.S. at 236–237, 87 S.Ct. at 1937, 18 L.Ed.2d 1149. (Footnote omitted.)

The view that *Mallory* applies to lineups is not novel doctrine. It was taken by Judge Burger (now Chief Justice Burger) in his concurrence in *Adams, supra.* Judge Burger, the author of four of the five opinions in which, prior to *Wade, Mallory* was not applied to lineups,[2] stated:

"\* \* \* The reason our earlier holdings do not apply is that the Supreme Court's decision in United States

v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), has made the underlying rationale of those cases irrelevant. \* \* \* It was natural for the cases following *Mallory* to concentrate on the exclusion of utterances, but not other forms of evidence. But *Wade* has changed this. Now that the right to counsel is an integral part of the lineup procedure, the warnings that are given at presentment and the opportunity to have counsel appointed are highly relevant to the lineup situation. *See* Fed.R.Crim.P. 5(b); 18 U.S.C. § 3006A(b) (1964). Since the *Mallory* rule was a response to the protections afforded by prompt presentment, it is appropriately applied to the lineup situation in the wake of *Wade.*"[3]

130 U.S.App.D.C. at 209, 399 F.2d at 580.

In the present case, Williams was arrested at 10:00 P.M. on June 21, 1965. The following morning, around 9:30, he was placed in the lineup at which Mrs. Neal identified him. Immediately following the lineup, and some 12 hours after his arrest, he was presented to a magistrate. At the trial Mrs. Neal identified Williams in court, and testified on direct examination to having identified him at the lineup. There were no exigent circumstances which required that Williams be immediately shown to witnesses prior to presenting him. *Compare* Stovall v. Denno, *supra.* Nor does any other reason appear why he should have been detained and subjected to a lineup before

2. *See* Note 1, *supra.* The fifth opinion, Mitchell v. United States, by Chief Judge Bazelon, contains only a one-sentence discussion of of the problem in a footnote. One of the four opinions by Judge Burger was a concurring opinion—Williams v. United States.

3. As in *Adams,* the lineup in the instant case was held prior to *Wade.* In *Stovall* the Supreme Court, in holding the new principle announced in *Wade* non-retroactive, placed great emphasis on "the unusual force" of the consideration that "retroactive application of *Wade* and *Gilbert* 'would seriously disrupt the administration of our criminal laws.'" 388 U.S. at 299, 300, 87 S.Ct. at 1971. This

was because of the large number of cases which would otherwise require new trials. This consideration is to a large degree absent here. The police, since the decision in *Mallory* 11 years ago, have known that defendants should be presented to a committing magistrate "as quickly as possible." 354 U.S. at 454, 77 S.Ct. 1356, 1 L.Ed.2d 1479. We have no reason to believe that this dictate has been widely ignored.

For a discussion of retroactivity and *Wade* in another context, *see* Judge Fahy's dissenting opinion in the panel decision in Fuller v. United States, filed November 20, 1967, affirmed, 132 U.S. App.D.C. 264, 407 F.2d 1199 (1968) (*en banc*).

his right to counsel was implemented by the United States Commissioner as required by law. 18 U.S.C. § 3006A(b) (1964); 2 D.C.Code § 2202 (1967). Therefore, in my judgment, it was error to allow Mrs. Neal's testimony about the lineup.

## II

A jury can return a verdict of guilty in a criminal case only if that verdict is freely given and unanimous. Andres v. United States, 333 U.S. 740, 68 S.Ct. 880, 92 L.Ed. 1055 (1948). Thus courts are alert to situations where there is a likelihood that one or more jurors has been coerced or confused in rendering his verdict.

There are two main situations where juror coercion has been a sufficiently real possibility that new trials have been required. The first is where the judge, in his communications to the jury, is unduly coercive. The cases usually arise in the context of the *Allen* charge, Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896)—the jury, having been unable to agree, is sent back by the judge for further deliberations. If the judge's instruction in sending the jury back had a "possibly coercive effect" the conviction is reversed. Williams v. United States, 119 U.S.App.D.C. 190, 193, 338 F.2d 530, 533 (1964). *See* Jenkins v. United States, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965); Green v. United States, 5 Cir., 309 F.2d 852 (1962).

The second situation, often entwined with the first, arises when a jury returns unable to agree, and the numerical division of the jury is revealed in court. Sending the jury back under such circumstances is coercive. Brasfield v. United States, 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345 (1926); Williams v. United States, *supra*. In *Brasfield* the Supreme Court, describing a procedure whereby the trial judge inquired of the jury its numerical division before sending it back, noted:

"* * * Such procedure serves no useful purpose that cannot be attained by questions not requiring the jury to reveal the nature or extent of its division. Its effect upon a divided jury will often depend upon circumstances which cannot properly be known to the trial judge or to the appellate courts and may vary widely in different situations, but in general its tendency is coercive. * * *"

272 U.S. at 450, 47 S.Ct. at 135, 71 L.Ed. 345. Further, even where the division is inadvertently revealed to the court by the foreman, the coercion is the same. Mullin v. United States, 123 U.S.App.D.C. 29, 356 F.2d 368 (1966).

A salutary device for insuring that a jury's verdict is freely given is the jury poll. The object of the poll

"is to give each juror an opportunity, before the verdict is recorded, to declare in open court his assent to the verdict which the foreman has returned and thus to enable the court and the parties to ascertain with certainty that a unanimous verdict has in fact been reached and that no juror has been coerced or induced to agree to a verdict to which he has not fully assented. [Citing cases.] * * *"

Miranda v. United States, 1 Cir., 255 F.2d 9, 17 (1958). The right to a jury poll is stated in Rule 31(d), Fed.R.Crim.P. Refusal to allow a poll when timely requested is a ground for a new trial. Miranda v. United States, *supra*; Mackett v. United States, 7 Cir., 90 F.2d 462 (1937). In some cases a poll can clear up apparent confusion on the part of the jury. Slocum v. United States, 8 Cir., 325 F.2d 465 (1965).

Unfortunately, however, sometimes the polling procedure itself creates a coercive or confusing situation. Thus in Bruce v. Chestnut Farms-Chevy Chase Dairy, 75 U.S.App.D.C. 192, 126 F.2d 224 (1942), a civil case, the jury returned a verdict for the defendant. When polled, two jurors stated their verdicts to be for the plaintiff. The court repeatedly

questioned them, and eventually they declared their verdict to be for the defendant. The judge then accepted the verdict. The Court of Appeals held that accepting the verdict was error because there was strong indication that the jury was not unanimous and the repeated efforts of the judge to obtain a unanimous verdict had a coercive effect.

A recent case illustrating this court's concern over potentially prejudicial jury polls is Jackson v. United States, 128 U.S. App.D.C. 214, 386 F.2d 641 (1967). There in response to a jury poll one juror replied, "I went along with the majority —guilty." The conviction in that case was affirmed because no objection was made at the time of the poll. However, in upholding the conviction the court warned of the necessity for the trial judge to "exhaust the solicitude appropriate to a situation of this kind." 128 U.S.App.D.C. at 216, 386 F.2d at 643. As to the need for certainty in a juror's vote, this court has stated:

> " * * * [E]ach juror's response to the poll must be sufficiently complete as to 'be unmistakable in meaning and clearly indicate his assent to the verdict announced by the foreman,' thus 'eliminating any uncertainty.' "

Frady v. United States, 121 U.S.App.D.C. 78, 83 n. 7, 348 F.2d 84, 89 n. 7 (en banc), cert. denied, 382 U.S. 909, 86 S.Ct. 247, 15 L.Ed.2d 160 (1965).

With this background, I set out fully the events of the jury poll in this case. I think that even a reading of the "cold print" makes it apparent that a most unfortunate, confused and potentially coercive situation took place in the trial of this capital case.

The foreman announced the jury's verdict and the defense requested that the jury be polled. When the first juror, Mrs. Lillian Ansher, was polled as to Williams she replied that he was guilty on Count 1, the murder count; asked "What is the punishment?" she replied, "Death—no. Life." As the next juror

was polled, Mrs. Ansher interjected the comment, "Life." The Williams poll was then completed.

After the Williams poll the jury was polled as to Coleman, Mrs. Ansher again being polled first. The following colloquy took place:

MR. NOONE [Defense Counsel]: May I ask that the jury be polled as to *Mr. Coleman?*

THE COURT: Let the jury be polled as to *Gerald Coleman.*

THE DEPUTY CLERK: Lillian Ansher, what say you as to the defendant *Gerald Coleman* on Count 1?

MRS. ANSHER: Innocent.

THE DEPUTY CLERK: I didn't hear what you said. Mrs. Lillian Ansher—.

MRS. ANSHER: Not guilty.

THE DEPUTY CLERK: What was that?

MRS. ANSHER: Not guilty.

THE COURT: Repeat the question to the juror.

THE DEPUTY CLERK: Mrs. Ansher, what say you as to the defendant Gerald Coleman on Count 1?

MRS. ANSHER: Guilty.

THE DEPUTY CLERK: What is the recommendation for punishment?

MRS. ANSHER: Prison.

THE DEPUTY CLERK: What was that?

THE COURT: Did you hear the question?

MRS. ANSHER: No.

THE COURT: Repeat the question, Mr. Clerk.

THE DEPUTY CLERK: What is your recommendation for punishment as to Gerald Coleman on Count 1?

MRS. ANSHER: Guilty.

THE DEPUTY CLERK: I say what is your recommendation for punishment?

\*  \*  \*  \*  \*  \*

MRS. ANSHER: I am confused right now.

\*  \*  \*  \*  \*  \*

THE DEPUTY CLERK: Mrs. Ansher, what is your recommendation—

THE COURT: I don't think she can hear you, because I can't hear.

THE DEPUTY CLERK: Mrs. Ansher, Lillian Ansher, what is your recommendation for punishment as to the defendant Gerald Coleman on Count 1?

MRS. ANSHER: To be convicted, I guess.

THE COURT: I can't hear you.

THE DEPUTY MARSHAL: Can you understand the Clerk?

MRS. ANSHER: Yes, I can.

THE DEPUTY CLERK: What is your recommendation for punishment of Gerald Coleman on Count 1?

MRS. ANSHER: Guilty.

THE COURT: You may step back. (Juror No. 1 returns to place in line of jurors.)

\*  \*  \*  \*  \*  \*

THE COURT: Continue the poll.

THE DEPUTY CLERK: Richard B. Sladen—

THE COURT: No. With respect to Count 3 [robbery count].

THE DEPUTY CLERK: Mrs. Lillian Ansher, what say you as to the defendant Gerald Coleman on Count 3?

MRS. ANSHER: Robbery, and killing.

(Emphasis added.)

The other jurors were then polled. The defense moved for a mistrial on the ground that Mrs. Ansher was incompetent. The court sent the jury back to the jury room and told them to "determine what is in fact their unanimous verdict \* \* \*." Twenty-two minutes later the jury returned and the foreman announced a unanimous verdict for each defendant, Williams and Coleman being found guilty on both the murder and robbery counts. The defense did not request a further poll and none was conducted. The court accepted the verdict.

When the Coleman poll began with Mrs. Ansher's thrice-repeated statement that Coleman was not guilty, the possibility, if not the probability, of dissension within the jury became obvious. The judge should have immediately sent the jury back for further deliberations. Instead, Mrs. Ansher was asked once again her verdict, and this time she answered "guilty." I think that having the question repeated four times until she answered "guilty" raised a possibility of coercion. Further, the poll was continued and Mrs. Ansher heard the other 11 jurors respond "guilty." Only after this was the jury sent back to reconsider its verdict. Thus Mrs. Ansher was publicly exposed as the one juror keeping the jury from convicting Coleman of this horrible crime. The possible coercive effect of this exposure is obvious.

This clearly was not an open-and-shut case. At a prior trial the jury had been unable to agree on a verdict. Before bringing in its verdict the second jury had deliberated three days, despite the fairly straightforward fact situation. The judge was considering using the *Allen* charge *sua sponte* when he was notified that the jury had reached agreement. Thus the trial court was on notice that there may have been deep and substantial doubt on the part of one or more jurors as to the guilt of the defendants. Under these circumstances, particularly the almost unbelievable first jury poll, when the jury returned its verdict the second time, in the interest of justice a poll was indicated. *See* Rule 31(d), Fed.R.Crim.P. Had another poll been taken when the jury returned less than half an hour later,

at least the nagging doubts raised by the first poll might have disappeared.[4]

The majority attempts to explain away Mrs. Ansher's statements that Coleman was not guilty on the murder count by relating them to Bland. The majority speculates that Mrs. Ansher may have been laboring under the impression that she was being asked about Bland when she answered "not guilty" as to Coleman. Before the Coleman poll began, she was advised three times that it was the Coleman poll.[5] Under the circumstances the speculation that Mrs. Ansher did not really mean it when she answered the poll three times that Coleman was not guilty, even if permissible, is not credible.

The unanimous verdict of a jury is the vehicle our law has chosen to determine guilt and authorize punishment for crime. Perhaps in a case like this, in which one jury failed to agree and another has been out three days deliberating, some impatience with a dissenting or confused juror when the other 11 are clear as to their verdict is understandable. But such impatience should not be allowed to affect the verdict, particularly in a capital case as close as this one.

### III

Given the result reached in Parts I and II of the majority opinion, I concur in Part III.

---

4. Rule 31(d), Fed.R.Crim.P., reads:
   "Poll of Jury. When a verdict is returned and before it is recorded the jury shall be polled at the request of any party or upon the court's own motion. * * *"
   Thus the judge has the power, and the duty where the interests of justice so indicate, to order a poll on his own motion. Here such a poll should have been taken, regardless of whether defense counsel, for tactical reasons or otherwise, failed to request one.

5. The transcript reads:
   THE DEPUTY CLERK: The jury has now been polled as to Robert E. Williams.
   MR. NOONE [Defense counsel]: May I ask the jury be polled as to *Mr. Coleman.*
   THE COURT: Let the jury be polled as to *Gerald Coleman.*
   THE DEPUTY CLERK: Lillian Ansher, what say you as to the defendant *Gerald Coleman* on Count 1?
   MRS. ANSHER: Innocent.
     *     *     *     *     *
   (Emphasis added.)